## Fischer & Porter Company v. Porter

*Gilbert P. High,* of *High, Swartz, Flynn & Roberts,* for plaintiff.

*Edward B. Duffy,* of *Duffy, McTighe & McElhone,* for defendant.

KNIGHT, P. J., October 22, 1948.—The facts as they are gathered from the complaint and amended answer are as follows: Defendant was formerly an officer and employe of plaintiff corporation. On December 31, 1942, defendant severed his connection with plaintiff, and ceased to be an employe and officer thereof. On March 11, 1943, plaintiff and defendant entered into an agreement, by the terms of which plaintiff purchased all of the stock of defendant in plaintiff corporation for the sum of $52,500.

This agreement contained the following covenants: "(e) Porter hereby assigns, transfers and sets over unto Company, its successors and assigns, any and all claim or claims for refund or refunds of his Income Taxes which may now exist or hereafter come into being, by reason of overpayment of the same for the

years 1937 to 1942, both inclusive, and agrees to execute any and all documents, which in the opinion of Company's representatives or counsel are or shall be necessary to obtain such refunds. Porter further agrees that any moneys which may come to him by reason of any claims for refund of income taxes shall be held by him in trust for Company and forthwith paid over to Company, its successors or assigns. It is expressly understood and agreed that Porter shall not be obliged to execute any documents necessary at any place other than the office of his or Company's attorney-at-law."

After severing his connection with plaintiff, defendant entered into a business of his own, and during the year 1943 suffered a substantial net operating loss. Under a provision of the Federal income tax laws in force when the above agreement was executed, a taxpayer was permitted to "carry-back" a net operating loss to the two years preceding the loss, and to claim a credit for such loss against income taxes paid in the preceding years.

Defendant made a claim for such credit on his income taxes for the year 1941. The claim was allowed, and on or about June 7, 1947, he received from the United States Government the sum of $8,777.32, plus interest of $1,187.82, or a total of $9,965.14, for the recovery of which this suit was brought.

Plaintiff contends that the above payment resulted in an overassessment of plaintiff's 1941 income tax, and under the terms of the agreement above quoted, it is entitled to the sum as a refund. Defendant answers that the payment made by the government was not the type of refund contemplated by the parties in the agreement of 1942, and that the refund did not result from an overpayment of defendant's income tax.

This is not a case in which defendant at this stage of the proceeding is attempting to vary, change or modify the terms of a written instrument by parol; the outcome depends upon an interpretation of the writing as above quoted.

The case of Gianni v. Russell & Co., Inc., 281 Pa. 320 (1924), and others that follow in its train, have no application for our present purpose. But where doubt exists "the way is open for the admission of parol evidence; not that the written contract may be altered, varied or contradicted in its terms, but that the court may place itself in the same situation as the parties who made the contract so as to view the circumstances as they viewed them, and be better able to judge of the meaning of the language of the contract": Bubb v. Parker & Edwards Oil Co., 252 Pa. 26 (1916).

While the pleadings are silent on the subject a dispute of fact was developed at the argument. Counsel for plaintiff declared that defendant's 1941 income tax was paid by plaintiff; this was denied by counsel for defendant.

The agreement attached to the complaint indicates that the 1942 income tax of defendant was to be paid by plaintiff, but says nothing as to who paid defendant's 1941 tax. We think the determination of this fact would throw light upon the meaning of the language used in the agreement.

It is an historical fact that when the agreement was executed, there was pending in the Congress of the United States a proposal to put individual taxpayers on a current tax-paying basis, which might have entailed the forgiveness of one year's taxes; which year was uncertain.

It seems to us that the fact that this pending bill was or was not discussed by the parties, would also help in interpreting the agreement.

Turning now to the agreement. By it defendant assigns to plaintiff "any and all claim or claims for refund or refunds of his income taxes which may now exist or hereafter come into being by reason of overpayment of the same for the years 1937 to 1942 both inclusive". The refunds that plaintiff became entitled to under the agreement were refunds "by reason of overpayment" of defendant's income taxes for the years mentioned. What did the parties mean by "overpayment" as used in the agreement?

Counsel for plaintiff in his brief quotes at length from the provisions of the Internal Revenue Code, and particularly the Revenue Acts of 1939 and 1942, providing for the "carry-back" of business losses to the tax assessment of prior years. Counsel points out that in these acts and the regulations issued under them, the "carry-back" of a business loss results in an overpayment of the tax of the year that is credited with the business loss, and in the regulations, this credit is referred to as an "overpayment" and the amount thereof as a refund of such "overpayment".

The fact that the Collector of Internal Revenue elects to call the "carry-back" an overpayment resulting in a refund does not necessarily mean that we must use the Internal Revenue Code as the sole basis for determining what the word "overpayment" means in the agreement.

The code itself, however, differentiates between ordinary refunds for tax overpayments and the type of reimbursement which defendant received. In 26 U. S. C. §3771, it is provided: "Interest shall be allowed and paid upon *any overpayment* in respect of any internal revenue tax at the rate of 6 per centum" from the date of such overpayment. (Italics supplied.) But, when the taxpayer's claim is based on the carry-back of a loss, §3771(*e*) declares that no interest shall be payable until the claim is filed.

The payment that defendant received was not the result of any payment that he made, or anything that he did or failed to do, while in the employ of plaintiff: it was the result of the business loss he sustained after he had severed all connection with plaintiff. Had he remained idle in 1943, or had his business been successful, there would have been no claim and no payment to him by the Government. This payment was the result of a loss, not of an overpayment.

One would hardly, in ordinary usage, describe the adjustments made possible by the acts of 1939 and 1942 as refunds of overpayments. This adjustment was made by reason of a "loss", and not by reason of an "overpayment".

The ordinary and usual meaning is to be given to words unless circumstances show that a different meaning is applicable. The ordinary and usual meaning of the word "overpay" is to pay too much, to pay more than is due. Defendant did not overpay his 1941 income tax; the adjustment of his 1943 loss entitled him to a return of a portion of what he paid as his tax for 1941.

The meaning of the word "overpayment" as used in the agreement, is, in our opinion, under the circumstances here existing, not free of doubt. It may be that, when the facts of the case are further developed, plaintiff may be entitled to a directed verdict in its favor, but it is only in cases clear and free from doubt that summary judgment should be entered, and this is not such a case. "Where a doubt exists as to whether a summary judgment should be entered, this should be resolved in favor of refusing to enter it": Chelten Ave. Bldg. Corp. v. Mayer, 306 Pa. 225 (1932).

And now, October 22, 1948, plaintiff's preliminary objections to defendant's answer are dismissed, and the motion for judgment on the pleadings overruled.