## Culhane's Estate.

Argued April 13, 1938. 

Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD,
PARKER and RHODES, JJ. 

*D. J. McLaughlin*, with him *J. R. Haughney*, for
appellant.

*William B. Washabaugh, Jr.*, with him *Arthur W.
Mitchell*, for appellees.

OPINION BY RHODES, J., November 22, 1938:

Catherine Culhane died January 26, 1935, leaving her
last will and testament executed September 29, 1933, in
which she provided that her residuary estate be di-
vided equally between Grace Ethel Albracht, her niece,
and Margaret Stanton, niece of her deceased husband.
For inheritance tax purposes, her estate was appraised
as consisting of realty valued at $3,500, and personal
property valued at $2,364.02. The account filed on No-
vember 11, 1935, by the executrix named in the will,

evidences receipt of $1,955.40 as the entire personalty in the estate, but the executrix charged herself with a restricted account in the Erie Trust Company, stating the then face value at $4,086.27. On November 18, 1935, Grace Albracht filed exceptions to this account, alleging cash accounted for by the executrix in the amount of $1,900 to be no part of the decedent's estate, but the exceptant's under the terms of a written agreement executed between decedent in her lifetime and exceptant, dated August 28, 1933. Testimony in support of the exceptions was heard in the court below on November 27, 1936. This testimony disclosed that on September 3, 1932, Miss Albracht and Mrs. Culhane went to the Erie Trust Company, where Mrs. Culhane had a savings account, and opened another savings account in the names of "Catherine Culhane or Grace Ethel Albracht," transferring to the new account the sum of $6,582.51, which had formerly stood in the name of Mrs. Culhane alone.

At the same time, the following agreement was executed by the two women: "We, the undersigned, hereby declare that we are the joint owners in joint tenancy of the money that is now or may hereafter be deposited in the Erie Trust Company in our names, and of any interest that may accrue or be credited thereto, and that either of us may draw and receipt for the whole or any part thereof, either before or after the death of the other and that at the death of either of us the survivor shall be the absolute owner of the balance then due the account, as surviving joint tenant, and is hereby authorized to receive the same from said bank on his or her individual check or order therefor. It is further stipulated that this agreement is not revocable except on notice in writing signed by both parties hereto.

"Witness our hands and seals.

(Signed) Catherine Culhane (Seal)

(Signed) Grace Ethel Albracht (Seal)

"Witness

    "C. C. Bliley (Signed)
    "Date—Sept. 3, 1932."

On August 28, 1933, the parties executed a second agreement, as follows: "It is stipulated and agreed to by and between Catherine Culhane, of the City of Erie, Penna., and Grace Ethel Albracht, of St. Louis, Mo., and the Erie Trust Company, of Erie, Penna., that the Savings Account, in the Erie Trust Company, of Erie, Penna., No. 73812, is owned by them as tenants by the entirety, and that upon the death of either, the bank account shall be and become the sole property of the survivor, without any further notice to the bank; that either shall have the right to withdraw the funds at any time after complying with such rules and regulations as the bank shall make.

"This agreement is made with the understanding of the parties that the account is held by the parties as tenants by the entireties and for the purpose of complying with the opinion of the Superior Court in the Estate of I. L. Crist, Deceased, 106 Superior Court reports, page 571.

"Witness our hands and seals this 28th day of August 1933.

    (signed) Grace Ethel Albracht (L. S.)
    (signed) Catherine Culhane   (L. S.)
    Erie Trust Company
    By: ..................... (L. S.)"

Some time later the Erie Trust Company passed into the control of the Division of Closed Banks of the State Banking Department, at which time the balance of the joint account was $6,693.29, the only credit to the account after the original deposit having been interest accrued as of December 15, 1932, in the amount of $115.18, and the only withdrawal one of $4.40 on June 1, 1933. The exceptant made no withdrawals.

On August 17, 1934, a check for $2,270.15, a first dividend (33 1/3%) on the joint account, payable to Catherine Culhane or Grace Ethel Albracht, was sent to Mrs. Culhane, who endorsed it and cashed it at the First National Bank of Erie on August 27, 1934. A similar check for a dividend (6 2/3%) of $454.03 was sent to Mrs. Culhane on December 15, 1934, and was also reduced to cash at the First National Bank of Erie on December 18, 1934. The $1,900 cash found at her death in a safe deposit box at the First National Bank of Erie, and accounted for by the executrix, was admitted to be the balance of the proceeds of these checks. This box was in the name of decedent and Mary Woods, a lessee of decedent. The court, on March 27, 1937, awarded the balance in the savings account in the Erie Trust Company, and the $1,900 found in the safe deposit box in the First National Bank of Erie, to exceptant, Grace Ethel Albracht, and directed the executrix to file a corrected inventory, and also to prepare and file a corrected account accordingly.

On April 8, 1937, a petition for a rehearing on the exceptions was filed by Margaret Stanton, colegatee with Grace Albracht of the residue of the decedent's estate, and on April 26, 1937, testimony in support of the petition was heard. At this hearing one Emma Sliter testified that on June 10, 1929, she had been an attesting witness to identical wills of this decedent and her husband, Michael Culhane. Her testimony was as follows: "Q. Were you present when that will [Michael Culhane's] was made out? A. Yes. Q. Where was it made? A. At Mr. Randall's office. Q. Carlton Randall's office? A. Yes. Q. Was any other will made simultaneously with that will? A. There was two wills. Q. Who made the other will? A. Mrs. Culhane. They were both identically alike. Q. Who made the other one, signed this one? A. Mrs. Culhane. Q. Was there any difference between the two wills? A. Identically alike, just alike.

Q. I notice in the second paragraph of Michael Culhane's will he gives all of his property to his wife, Catherine? A. Yes. Q. And what did her will have in place of that? A. The same; it was to be to one another. Q. Hers was to Michael? A. And Michael's was to her. ...... Q. Were you a witness on both wills? A. On both wills. Q. Did you read the contents of the wills? A. Yes. Q. Did you hear them discussed? A. Yes. Q. I ask you whether there was any difference between the two wills in any respect with regard to what was to happen to the property on the death of the survivor? A. There was no difference at all. On the death of the survivor it was to be divided after all bills in the estate was settled. Q. Between whom? A. Between the two favorite nieces. The favorite niece was Miss Stanton and the other was Miss Albracht. Q. Whose favorite niece was Miss Stanton? A. Miss Stanton was Mr. Culhane's and Miss Albracht was Mrs. Culhane's. That was thoroughly understood. Q. Did they agree the property should be disposed of? A. The property was to be sold and everything—Mr. Randall recommended that the bank would be the— Q. I am asking you whether there was an agreement the property should be divided between the two favorite nieces at the death of the survivor? A. Yes. Q. I ask you whether that was understood to be a final disposition? A. It was understood final because it was to be sold and what money or whatever there was was to be divided equally and both seemed very much pleased about it. Q. Pleased? A. Oh, yes, very much so because she turned to me and said it was lovely of him. Q. Of Mr. Culhane to do it that way? A. Yes. I know that very well. ...... Q. Did you see the witnesses sign the wills? I mean did you see the other witness sign, sign as a witness? A. Mr. Randall, yes. Q. You saw him sign? A. Yes. Q. And of course at that time the provisions of the wills were discussed between the parties? A. Between Mr. and Mrs. Culhane? Q. Yes. A. They talked

about their wills and made little changes after he had drawn it up. It was straightened out and fixed up when we left the office. It was all read and I signed it and it seemed all right. Q. Was it suggested by anyone a contract had been made between the parties these wills should become a contract at the time of the execution? A. Was it suggested by anyone? Q. Yes. A. Why, only themselves, just themselves. I didn't just get what you mean by that. Q. Mr. Randall drew the wills, did he? A. Yes, very carefully. ...... Q. In addition to the wills was any other paper executed at that time? A. Oh, no, just the wills. There was nothing else. Q. Was there any conversation that another paper ought to be executed? A. No. Q. There was no other? A. There was no other paper. There was nothing but the wills. Q. And in their discussion of it no suggestion was made that another paper ought to be signed by the parties? A. No."

This hearing was followed on April 27, 1937, by the filing of exceptions to the decree of March 27, 1937, on behalf of the executrix, and the legatee, Margaret Stanton. On July 7, 1937, the learned court below sustained these exceptions, revoked and set aside the decree of March 27, 1937, dismissed the exceptions of Grace Albracht to the account, confirmed the account absolutely, and directed distribution of the balance between the residuary legatees. Grace Ethel Albracht appealed.

The will alleged to have been executed by Catherine Culhane on June 10, 1929, is not in evidence, and it seems that it was either lost or destroyed. However, appellant's position is based on the will of September 29, 1933, and appellees also seem content to abide by the terms of that will. In their brief they say: "Rather than set aside any of the provisions of this will of September 29, 1933, we ask the Court to give it complete validity and to hold that the joint account withdrawing a portion of the estate Mrs. Culhane received from her husband from its operation to be in fraud of Miss Stanton's

rights under the agreement pursuant to which the wills were made." In the opinion of the learned court below it is said: "The complaint here is not with the terms of the will but to the attempt of Grace Ethel Albracht and Catherine Culhane by means of the two agreements to create a joint bank account for their special benefit and thereby to leave no residue or remainder in the personal estate upon which the residuary clause could operate and thus to defeat the very purpose which was agreed to when the reciprocal wills were executed."

Consequently, the real controversy between the parties is whether the wills of Michael Culhane and Catherine Culhane were executed pursuant to an agreement that they were to be irrevocable.

Appellees endeavor to sustain entirely the decree of the court below on two grounds, and to sustain it on a third ground in so far as it relates to the sum of $1,900 found in the safe deposit box.

Appellees' first contention is that the evidence was sufficient to establish the making of a contract between Michael Culhane and Catherine Culhane for the execution of mutual wills which were to be irrevocable, and that the creation of the joint bank account by Mrs. Culhane and appellant was in fraud of Miss Stanton's rights under that agreement. Such contracts are valid when properly proved, and they are enforced in most jurisdictions. The rule is stated in *McGinley's Estate*, 257 Pa. 478, at page 483, 101 A. 807, at page 808, where our Supreme Court said: "It is well settled that one may enter into a valid contract to dispose by will of his property, real or personal, in a particular way, and that such will is irrevocable and the contract will be specifically enforced. There are many examples of the recognition of this doctrine in this State and other states: *Cawley's Est.*, 136 Pa. 628 [20 A. 567]; *Smith v. Tuit*, 127 Pa. 341 [17 A. 995]; *Wright's Est.*, 155 Pa. 64 [25 A. 877]; *Shroyer v. Smith*, 204 Pa. 310 [54 A. 24];

*Lewallen's Est.,* 27 Pa. Superior Ct. 320; *Park v. Park,* 39 Pa. Superior Ct. 212; *Frazier et al. v. Patterson et al.,* 27 L. R. A. (N. S.) 508, and notes. In Thompson on Wills, Section 28, the learned author says: 'Mutual wills, that is, where two persons execute wills reciprocal in their provisions, but separate instruments, may or may not be revocable at the pleasure of either party, according to the circumstances and understanding upon which they were executed. To deprive either party of the right to revoke such mutual wills, it is necessary to prove such wills were executed in pursuance of a contract or a compact between the parties and that each is the consideration for the other.' "

The question in almost every case, as it is in the case at bar, is the sufficiency of the evidence to establish the contract relied upon. We express no opinion as to the rule to be applied where the wills on their face express the terms of the contract, because that is not the situation in the case at bar. In a case like the present one we are of the opinion that in order to sustain the contract there must be proof of it aliunde the wills notwithstanding that the parties were husband and wife. See *Rhodes' Estate,* 277 Pa. 450, 121 A. 327; *Hoffert's Estate,* 65 Pa. Superior Ct. 515; *Beveridge v. Bailey, Ex'r,* 53 S. D. 98, 220 N. W. 462, 60 A. L. R. 619; *Gray et al. v. Perpetual Trustee Co., Ltd. et al.* ([1928] Eng., A. C. 391), 60 A. L. R. 613; *Canada v. Ihmsen,* 33 Wyo. 439, 240 P. 927, 43 A. L. R. 1010; *Edson v. Parsons,* 155 N. Y. 555, 50 N. E. 265; 69 C. J. p. 1300, §2722; Id. op. p. 1304 §2731. We are not persuaded by those authorities which hold to the contrary *(Wilson v. Starbuck,* 116 W. Va. 554, 182 S. E. 539, 102 A. L. R. 485; *Underwood v. Myer,* 107 W. Va. 57, 146 S. E. 896; *Stevens v. Myers,* 91 Ore. 114, 177 P. 37, 2 A. L. R. 1155).

It is not pretended in the instant case that the terms of the contract appear on the face of the wills them-

selves, and the only evidence aliunde the wills, offered to prove the contract, is the testimony of Emma Sliter, the material portions of which we have heretofore quoted.

This testimony is clearly insufficient to support a finding that a contract was made for the execution of mutual, irrevocable wills. The nature of the proof required to establish a contract like that here in question is well described in *Dicks v. Cassels et al.,* 100 S. C. 341, 84 S. E. 878, where the court said: "To establish an agreement such as is claimed by the plaintiff here, the proof must be definite, certain, clear, and convincing. ...... The maker of the will is dead, and the degree of proof establishing a contract whereby a will is made that cannot be revoked by the maker ought to be clear and convincing, certain and definite, and scrutinized and received with the greatest of care; for it practically deprives the owner of property of any interest in the property except to enjoy it for life. ...... In *McKeegan v. O'Neill,* 22 S. C. [454], 468, this court says: 'Such a contract, especially when it is attempted to be established by parol, is regarded with suspicion, and not sustained except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the decedent.' " The testimony of Miss Sliter throws no light upon what actually passed between Michael Culhane and Catherine Culhane when the wills were made. Her testimony consists only of her interpretation of their statements and actions.

In *Cornell et al. v. Green, Adm'r,* 10 Serg. & R. 14, at page 16, GIBSON, J., said: "It is a good general rule, that a witness is not to give his impressions, but to state the facts from which he received them, and thus leave the jury to draw their own conclusion; and wherever the facts can be stated, it is not to be departed from." In the case at bar it does not appear that there

was anything to prevent Miss Sliter from stating the facts. As was said in *McKim v. Philadelphia*, 217 Pa. 243, at page 252, 66 A. 340, at page 344: "Where mere descriptive language is inadequate to convey to the jury the precise facts, or their bearing on the issue, a witness may be allowed to supplement his description by his opinion, to put the jury in position to determine the facts in issue; but when the circumstances are such that they can be fully and accurately described to the jury, and their bearing on the issue, estimated by persons without special knowledge or training, opinions of witnesses, expert or other, are inadmissible: *Graham v. Pennsylvania Co.*, 139 Pa. 149 [21 A. 151]." The rule is the same where the court sits as a fact-finding body. See *Bubb v. Parker & Edwards Oil Co.*, 252 Pa. 26, 97 A. 114.

In *Sorber v. Masters et al.*, 264 Pa. 582, at page 587, 107 A. 892, at page 894, the court said, in commenting upon the testimony of witnesses, which was deemed insufficient to establish the contract relied upon in that case: "But, in place of stating, in totidem verbis, what was then said, they insisted upon giving their own version, which, so far as anyone can tell, may consist of mere deductions, or conclusions; except, possibly, at one point in the testimony, and, in this isolated instance, the evidence was not by any means sufficiently full to prove the bargain averred."

A contract is not proved by evidence of a conversation in which one party states mere conclusions as to the making of the contract. *Red Line Mutual Telephone Co. v. Pharris*, 82 Neb. 371, 117 N. W. 995.

The evidence being insufficient to establish the contract upon which appellees relied, it becomes unnecessary to discuss other propositions suggested in this phase of the argument.

The next contention of the appellees is that, under the circumstances of the instant case, the joint account

was a testamentary device and did not operate as a valid gift inter vivos from Mrs. Culhane to appellant. This contention cannot be sustained. In view of our conclusion that appellees' proof did not establish a contract to make mutual irrevocable wills, there was nothing to prevent Mrs. Culhane from disposing of her property as she wished. The evidence in this connection, buttressed as it was by the two agreements executed by Mrs. Culhane and appellant, and which we have quoted above, was sufficient to sustain the validity of the joint account as an inter vivos disposition within the principles of *Mardis v. Steen,* 293 Pa. 13, 141 A. 629; *Reap v. Wyoming Valley Trust Co.,* 300 Pa. 156, 150 A. 465; *Mori's Estate,* 318 Pa. 261, 178 A. 492; *Mader et al. v. Stemler et al. (App. No. 9),* 319 Pa. 374, 179 A. 719. The facts of the case at bar distinguish it from *Flanagan v. Nash,* 185 Pa. 41, 39 A. 818, *Grady v. Sheehan,* 256 Pa. 377, 100 A. 950, *Zellner's Estate,* 316 Pa. 202, 172 A. 715, *Crist's Estate,* 106 Pa. Superior Ct. 571, 162 A. 478, *Gallagher's Estate,* 109 Pa. Superior Ct. 304, 167 A. 476, in each of which a contrary conclusion was reached.

The joint account was not testamentary as appellees contend. We do not find in the record evidence to afford an inference that the joint account was created by Mrs. Culhane in lieu of a will. Whatever the secret intentions of the parties may have been, they are of no force in view of the explicit terms of the written agreement of September 3, 1932. It is obvious that the agreement dated August 28, 1933, could not make the parties, who were not husband and wife, tenants by the entirety of the bank account. However, it did not cancel or invalidate the agreement of September 3, 1932, and it was clearly indicative of the intentions of the parties as expressed in the latter agreement.

The contention of appellees that the sum of $1,900, found in the safe deposit box, was severed from the

effects of the joint account from which it was derived remains. Once again, the evidence falls short of supporting appellees' position. We emphasize the fact that this fund was the balance of the proceeds of two dividends on the amount of the joint deposit at the time the Erie Trust Company passed into the control of the Division of Closed Banks of the State Banking Department. They were not voluntary withdrawals by Mrs. Culhane. The dividends were a proportion of each dollar on deposit in the joint account, and the situation must be differentiated from that where one of the joint depositors withdraws some of the money deposited to the credit of both, but leaves an intact balance remaining. In other words, the sum paid as dividends on the account in the instant case represented not the proportion of the dividend subtracted as an entire sum from the account as it originally stood, but instead represented the proportion of the dividend calculated upon each dollar in the account at that time. This money was placed by Mrs. Culhane in a safe deposit box in the name of herself and another person who was not a party to this proceeding. Except as it is shown by those facts, there is no evidence that Mrs. Culhane, in disposing of this money as she did, acted with any intention to destroy whatever interest appellant might have therein. On the other hand, the evidence is that Mrs. Culhane had lost her confidence in banks, and chose to put the currency in the safe deposit box because that appeared to her to be the most desirable place in which to keep it.

When the joint account was created in the manner to which we have heretofore referred, a present joint interest in the chose in action, with the right of survivorship, thus vested in appellant by assignment. See *Mader et al. v. Stemler et al.,* supra. That it may have been understood between Mrs. Culhane and appellant that the latter was not to use any of the funds during

the lifetime of the former is not controlling; it was so held in *Rockefeller v. Davenport et al.,* 277 Mass. 105, 177 N. E. 856. The conclusions relative to withdrawals from accounts of this nature are conflicting. See Annotation 77 A. L. R. 799. But we think that under the peculiar facts of this case there is no evidence from which it could be said that the cashing of the dividend checks, and the placing of the proceeds in a safe deposit box manifested an intention by Mrs. Culhane to appropriate to herself the fund in question. The agreement of September 3, 1932, provided: "It is further stipulated that this agreement is not revocable except on notice in writing signed by both parties hereto." "Where a transaction is explainable upon either of two different theories, one of which is consistent with good faith and fair dealing and the other involves fraud and deception, the explanation consistent with honesty and legality will be accepted unless the evidence clearly preponderates in favor of the illegal aspect of the transaction": *Utah Nat. Bank v. Nelson,* 38 Utah 169, 196, 111 P. 907. The conclusion is logical that appellant's interest, as a joint owner of the bank account, a chose in action, with the right of survivorship, in the remaining cash which Mrs. Culhane had received as a dividend on the funds in the joint account was not divested; that appellant's rights thereto as one of the parties to the joint account were not destroyed.

While the result that we have reached may be contrary, as appellees contend, to that originally desired by Michael Culhane, the failure is not in the law but in the evidence. The record in this case must determine its disposition; conjecture cannot supply what the record does not contain.

The first assignment of error questions the admissibility of any of the testimony of Emma Sliter. As we are of the opinion that her testimony was insufficient to establish the alleged contract between Michael Cul-

hane and Catherine Culhane, its admissibility in whole or in part becomes immaterial. The second, third, and fourth assignments of error are sustained.

The decree of the court below is reversed, and the balance in the savings account in the Erie Trust Company, and the $1,900 in cash in the safe deposit box in the First National Bank of Erie, are awarded to the exceptant, Grace Ethel Albracht; the executrix of the last will and testament of Catherine Culhane, deceased, is directed to file a corrected inventory and a corrected account accordingly.

The costs are to be paid from the funds in the hands of accountant, appellee.

---

President Judge KELLER and Judge STADTFELD would affirm the decree of the court below as to the disposition of the $1,900 found in the safe deposit box of Mrs. Culhane.