J-S07016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF W.R.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1036 WDA 2021 |

Appeal from the Decree Entered August 9, 2021
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s):   32-20-0414

BEFORE:  OLSON, J., SULLIVAN, J., and PELLEGRINI, J. [*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED:  April 20, 2023**

Before us is an appeal by L.M. (Father) from a decree entered by the Court of Common Pleas of Indiana County Orphans' Court (orphans' court) granting a petition for involuntary termination of parental rights filed by M.T. (Mother) and her husband B.T. (Stepfather) to terminate Father's parental rights to his daughter W.R.S. (Child) born in June 2016.  Stepfather is the proposed adoptive father of the Child.  We vacate and remand.

**I.**

Our review of the certified record reflects the following factual and procedural history.  Mother and Father had a brief non-committed relationship. When Mother informed Father of her pregnancy, Father did not participate in Mother's medical appointments prior to Child's birth and was not present at

_____

[*] Retired Senior Judge assigned to the Superior Court.

the birth of the Child. He is not listed on the Child's birth certificate. Prior to Child's birth, Father was convicted and sentenced for drug-related and domestic violence offenses and was incarcerated in June 2016.

Shortly after Child's birth, Mother began a relationship with Stepfather. They began living together in June 2017 and married in July 2020. Stepfather has assisted in raising Child and supporting her financially and has been the sole paternal figure in her life.

Father had no contact with Mother until approximately one year after Child's birth when he sent a letter to Mother from prison. Father remained in prison until April 2, 2019. He had no contact with Child while he was incarcerated but spoke with Mother on the phone and wrote her approximately 15 letters over that three-year period. Father's only contacts with Child occurred following his release from prison. According to Mother, at her invitation, Father attended a birthday party for Child in July 2019 and "got her some birthday presents and cupcakes, and he just talked with [Stepfather] mostly." *See* N.T., 7/26/21, at 15.[1] Father saw Child a second time "maybe three or four weeks later," again at Mother's invitation. *Id.* Mother's recollection of this interaction is that Father "got to see [Child] and have a conversation with her and she just kept on playing." *Id.* Father has not seen Child since those visits.

_____

[1] The notes of testimony incorrectly bear the date July 26, 2020.

Father generally blamed Mother for his lack of contact with Child, indicating that he reached out to Mother in "March and May" of 2020 to try to see Child, but Mother blocked him on her phone and on her Facebook account. *Id.* at 41, 42, 50-51. Father contends that he did not make any other efforts to have a relationship because he was afraid Mother would pursue criminal charges if he continued to seek contact. *Id.* at 40-51.

Mother admitted that she became unwilling to permit Father to have contact with Child; she blocked Father on her Facebook account[2] and her phone; she would not have allowed Father to have even supervised contact with Child if he had requested it; and that Father did not know the address where she resided for the last two years. *Id.* at 17, 21-26. Mother indicated that her last contact with Father involved an exchange of heated text messages that occurred sometime in 2020, after which she "just blocked him." *Id.* at 23.

In the months following the last exchange of text messages, Father learned of Mother's new address from a third party. *Id.* at 41. He then filed a complaint for custody and a complaint to establish paternity/request for genetic testing. Father's custody and paternity pleadings are not in the

_____

[2] At the termination hearing, Mother asserted that she was no longer blocking Father on Facebook but did not indicate when the blocking ended. *See* N.T., 7/26/21, at 22. At the hearing, Father said that he was still blocked from Mother's Facebook account. *Id.* at 41. Mother did not indicate that she had ever stopped blocking Father on her phone. *Id.* at 23.

- 3 -

certified record, but the orphans' court indicates that Father filed these pleadings on or about October 14, 2020.[3]  **See** Orphans' Court Opinion, 9/17/21, at unnumbered 1.  One week later, on October 21, 2020, Mother and Stepfather filed a petition to involuntarily terminate Father's parental rights as well as a petition for adoption of Child by Stepfather.  After a continuance, the orphans' court conducted a termination hearing on April 13, 2021, and entered a decree on April 16, 2021, granting the petition to involuntarily terminate Father's parental rights to Child.

On April 20, 2021, despite the involuntary termination of Father's parental rights, the orphans' court conducted a hearing on Father's complaint to establish paternity/request for genetic testing.  At the hearing, Father claimed that although he was aware that the original termination hearing had been continued, he did not receive notice of the rescheduled hearing date of April 13, 2021.  Considering this information, the orphans' court vacated the April 16, 2021 decree and scheduled a new termination hearing.

_____

[3] Father's custody complaint was filed at docket number 11801 CD 2020, whereas Mother and Stepfather filed the termination petition at docket number 32-20-0414.  Because the orphans' court proceeded with the termination proceedings at docket number 32-20-0414, the record for the custody proceedings at docket number 11801 CD 2020 was not transmitted to this Court.

On July 26, 2021, the orphans' court conducted a second termination hearing at which Mother, Stepfather and Father testified.[4] The orphans' court denied Father's request for genetic testing because Mother did not dispute that Father was Child's biological father. On August 9, 2021, the orphans' court entered a decree granting Mother and Stepfather's petition to involuntarily terminate Father's parental rights to Child.

Father's counsel filed a timely notice of appeal and a concise statement of errors complained of on appeal. Father's counsel also filed a statement of intent to file a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967). The orphans' court then ordered Father to file a second concise statement and Father timely complied.[5] The orphans' court then authored a Rule 1925(a) opinion.

On appeal, Father's counsel filed an *Anders* brief and a petition to withdraw from representation. We denied counsel's petition to withdraw and

---

[4] The orphans' court appointed counsel to represent Child's legal interests. Child's counsel joins with Mother and Stepfather in urging that Father's appeal be dismissed.

[5] The orphans' court docket indicates that Father filed his second concise statement on September 13, 2021; however, it is absent from the orphans' court record. Father's notice of appeal is not in the orphans' court record. Upon review, it appears that the orphans' court transmitted the original notice of appeal to this Court, rather than a copy. *See* Pa.R.A.P. 905(b) (providing that "[t]he clerk [of the orphans' court] shall immediately transmit to the prothonotary of the appellate court named in the notice of appeal a copy of the notice of appeal").

directed counsel to file an advocate's brief on Father's behalf. Counsel complied with our directive and this matter is now ripe for our review.[6]

Father raises the following general issues for our review:

1. Whether Mother and Stepfather failed to prove by clear and convincing evidence that grounds for termination existed pursuant to 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether Mother and Stepfather failed to prove by clear and convincing evidence that the best interests of the Child would be served by terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(b)?

_____

[6] Our standard of review of a decree involuntarily terminating parental rights is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted). "The [orphans'] court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the [orphans'] court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

Father's Brief at 5 (unnecessary capitalization omitted).

## II.

## A.

Termination of parental rights is governed by Section 2511 of the Adoption Act. *See* 23 Pa.C.S. § 2511. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see also* 23 Pa.C.S. § 2511(a)(1)-(11). In this case, the orphans' court terminated father's parental rights to the child pursuant to subsections 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b); *see also In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008).

Though we do not adhere to any strict definition of "parental duty," a child has a right to essential parental care, and our jurisprudence reveals certain irreducible qualities of a parent's attendant obligation. *C.M.*, 255 A.3d at 364. Foremost, it is a positive duty requiring an affirmative performance. *Id.* As our Supreme Court has explained:

> Parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. A parent must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or his rights may be forfeited. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (internal citations, brackets, and quotation marks omitted).

However, even if a parent has failed to perform affirmative parental duties for a period in excess of six months, the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, under the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights. The totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of

parental rights would have on the child pursuant to subsection 2511(b). *Id.* at 365.

It is within this framework that an orphans' court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. *See In re Adoption of L.A.K.*, 265 A.3d 580, 593 (Pa. 2021). What may constitute a "barrier" in the context of a Section 2511(a)(1) analysis will vary with the circumstances of each case. *Id.* "In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship." *Id.* In other instances, orphans' courts have found substance abuse, mental health issues, homelessness, joblessness, criminal charges or a confluence of some or all these issues created barriers to the maintenance of the parent-child relationship. *Id.*

**B.**

In his first issue on appeal, Father contends that under *C.M.* and *L.A.K.*, his filing of a custody complaint within six months of the filing of a termination petition, without more, constitutes the affirmative performance of a parental duty, preventing Mother and Stepfather from meeting their evidentiary burden under subsection 2511(a)(1). That is an overly-broad reading of those cases because in each of those cases, there was much more. Let us examine each of those cases in more detail.

In **C.M.**, our Supreme Court considered the significance and effect of custody-related legal filings by a parent in a subsection 2511(a)(1) analysis. In that case, before the child's birth, father and mother lived in Texas. Father was present at the hospital for C.M.'s birth in Pennsylvania in January 2016 and purchased a crib and changing table for use at maternal grandparents' home. He went back alone to Texas and mother and child resided with maternal grandparents in Pennsylvania. Father returned to Pennsylvania in the spring or summer of 2016. Initially, he had difficulty reaching mother, but through his consistent efforts to contact her, he arranged six visits between August and early October of that year. Mother then refused to schedule further visits, hung up the phone when father called, and did not allow him to deliver Christmas presents. After more than two years, father filed a custody action. Two months later, mother and maternal grandparents sought the termination of father's parental rights. The orphans' court denied the petition to terminate.

Our Supreme Court held that because father had initiated and actively pursued a complaint for custody in the two months prior to the filing of the termination petition, including attending court-ordered mediation and conciliation proceedings, the orphans' court did not abuse its discretion in holding that his actions demonstrated an "affirmative performance of [his] parental duties to the maximum extent apparent at the time under the circumstances." **C.M.**, **supra**, at 368. It explained that a parent's efforts to

enforce his or her legal custody rights unquestionably establishes the affirmative performance of a positive parental duty. When such action is taken in the face of a custodial parent's efforts to thwart access to the child, the attempts to enforce custodial rights provide evidence that is "highly relevant"[7] to the question of whether the requirements of subsection 2511(a)(1) have been met. *Id.* at 367.

Our Supreme Court held that "because . . . [f]ather continuously exercised parental duties during the two months preceding the filing of the [termination] petition, appellants did not meet their burden to establish by clear and convincing evidence he failed or refused to perform parental duties, or a settled purpose of relinquishment, for a period of at least six months immediately preceding the filing of the petition." *Id.* (internal citations omitted).

A few months after deciding *C.M.*, our Supreme Court again considered the significance and effect of custody-related legal filings in a subsection 2511(a)(1) analysis. *See L.A.K.*, *supra*. In *L.A.K.*, mother and father were married and shared two children. Largely as a result of father's alcoholism, mother and father separated in 2015 and divorced in 2017. When they separated, L.A.K. was three years old and A.L.K. was seven months old and

---

[7] That Father's custody petition was filed with a request for genetic testing undercuts its relevancy as an exercise of his parental duties.

mother retained custody of the children. Father last saw the children in January 2016 and never exercised his rights under a custody order. He refrained from contact with his children until he had attained a year of sobriety and then instituted a legal action to modify the existing custody order so that he could begin to establish a relationship with them. Approximately one week later, mother and stepfather filed petitions to involuntarily terminate father's parental rights, which the trial court denied. Our Supreme Court concluded that the trial court acted within its discretion by denying termination because "[i]t is crystal clear, and of vital importance . . . that a parent's legal efforts to enforce custodial rights demonstrate affirmative performance of a positive parental duty." *Id.* at 594 (citing *C.M.*, *supra*, at 367).

Here, Father argues that under *C.M.* and *L.A.K.*, the mere filing of a custody complaint, without more, constitutes the affirmative performance of a parental duty which prevents Mother and Stepfather from meeting their evidentiary burden under subsection 2511(a)(1) that he evidenced a settled purpose of relinquishing parental claim. However, those cases do not hold that the mere filing of a custody proceeding in the six months before a termination proceeding conclusively establishes that the parent was carrying out his parental duties. Rather, the custody proceedings only provide evidence that is "highly relevant" to the question of whether the requirements of subsection 2511(a)(1) have been met under a totality of the circumstances analysis. *C.M.*, *supra*, at 367.

Both **C.M.** and **L.A.K.** involve whether the trial court abused its discretion in denying the termination petition by giving weight to the filing of the custody proceeding in the totality of the circumstances analysis. However, that is not the only factor that is relevant. In **L.A.K.**, our Supreme Court did not halt its analysis once it determined that father had performed a parental duty by filing a custody complaint during the statutory six-month period. It went on to analyze the totality of the circumstances by explaining that father had a relationship with the child prior to the six months at issue, had ceased contact to address his alcoholism and had attempted to reestablish the relationship through a custody petition when he had achieved sobriety. **L.A.K.**, **supra**, at 595.

That leads us to Father's contention that the orphans' court abused its discretion in concluding that he evidenced a settled purpose of relinquishing his parental claim rather than finding that he was precluded from engaging in his parental duties because of obstacles placed by Mother.

**C.**

Father contends that Mother erected barriers to his exercising his parental responsibilities because she blocked him from contacting her through her phone and Facebook account and he was unable to ascertain her address.

There is no dispute that Father has no relationship with Child and Child would not recognize Father if he saw him. When Child was born in 2016, Father was incarcerated. He has only visited Child on two occasions: in July

2019 when Mother invited him to Child's birthday party and again at Mother's home three to four weeks later. He purportedly sent Christmas presents one year, but Mother testified that they were not delivered. He has not provided or offered to provide financial support for Child.

Nonetheless, Father contends that his failure to maintain a relationship with Child after he was released from prison was because Mother erected barriers to an extent that excuses his failure to carry out his parental responsibilities. One of the impediments that he alleges is that Mother blocked him on her Facebook account. Mother admitted that she blocked him on Facebook because he stated that he wanted to "take [Child] back to Cleveland" and he "texted [her] a lot of negative names." N.T., 7/26/21, at 23. Father also asserts that Mother blocked him from calling her on the phone. Mother disagreed, pointing out that he was able to contact her by phone multiple times during and after his incarceration from 2016 through 2019, *see* N.T., 7/26/21, at 37-38, and that they texted on multiple occasions in 2020, *id.* at 17, 41. Mother's phone number did not change throughout Child's life. *Id.* at 18. Moreover, the testimony showed that Father could have contacted Child's Stepfather through Facebook or obtained Stepfather's phone number from his Facebook account. *Id.* at 35.

Father also relies on his inability to ascertain Mother's current address. Ignoring whether being unable to ascertain her address is an "active" interference, there is no evidence of what steps Father took to determine the

address. Mother and Stepfather testified that they have lived in the small town of Clymer, Pennsylvania for several years, and only moved a few houses away on the same street since the time when Father had visited their home in 2019. Further, Stepfather still owned the previous home where Father had visited, and the tenants at that home could have easily directed Father to Mother's new house several doors away. *Id.* at 31.

The question then is whether Father has sufficiently established that there were active barriers to his exercising his parental responsibilities. Our Supreme Court, again in *L.A.K.*, *supra*, at 592-93, has stated that parties claiming that "barriers" prevented them from meeting their responsibilities must show that they exercised diligence in overcoming them. "[T]he question whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977); *see also Matter of Adoption of David C.*, 387 A.2d 804, 807 (Pa. 1978). Our Supreme Court has explained that:

> [a] finding of abandonment, which has been characterized as "one of the most severe steps the court can take," *Sarver Adoption Case*, 281 A.2d 890, 891 (Pa. 1971), will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.
>
> *Burns*, 379 A.2d at 540. Decades ago, this Court clarified that "[a] parent's efforts are always considered 'in light of existing circumstances.'" *In re D.J.Y.*, 408 A.2d 1387, 1390 (Pa. 1979) (quoting *David C.*, 387 A.2d at 807). Thus, the focus of the inquiry is on whether, under the circumstances, the parent has

- 15 -

acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties. ***In re M.A.K.***, 414 A.2d 1052, 1054 (Pa. 1980); ***see also C.M.***, 255 A.3d at 365 (providing that inquiry focuses on whether under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship).

***L.A.K.***, ***supra***, at 592-93 (cleaned up).

However, the trial court has never addressed whether there were barriers that substantially impeded Father's exercise of parental responsibilities. Because this is an issue of fact for it to address in the first instance, we must remand this matter to the trial court to determine whether there were substantial barriers preventing Father from exercising his parental responsibilities, whether those barriers were reasonable and whether he took appropriate actions, with "reasonable firmness" to overcome those barriers.[8]

***Id.***

Decree vacated and remanded. Jurisdiction relinquished.

Judge Olson joins the memorandum.

Judge Sullivan files a concurring memorandum.

Judgment Entered.

_____

[8] Based on our disposition, we need not address Father's second issue on appeal. Nevertheless, he has waived his argument challenging the orphans' court's analysis under subsection 2511(b) for failure to develop it in his brief. ***See Green v. Green***, 69 A.3d 282, 285 n.3 (Pa. Super. 2013).

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date:  <u>4/20/2023</u>